UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
ILKA RIOS, ALISON BUSH, JOYCE CULLER, : ECF Case
PAMELA STEWART-MARTINEZ, and :
WINIFRED COULTON, : Case No.: 16-cv-6448 (KMW)
:
on behalf of themselves and all other persons who :
reside in Bronx County, New York, and who have :
been denied without due process of law an equal :
opportunity to participate in the political :
processes, to cast a meaningful vote for a :
candidates of their choice, or to hold their elected :
representatives accountable, who are similarly :
situated, :
                       Plaintiffs, :
:
      -against- :
:
STANLEY KALMON SCHLEIN, THE :
EXECUTIVE COMMITTEE OF THE BRONX :
DEMOCRATIC COUNTY COMMITTEE, and :
UNIDENTFIED CO-CONSPIRATORS 1-100, :
:
                       Defendants. :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

# PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF
# THEIR MOTION FOR A PRELIMINARY INJUNCTION

Donald R. Dunn, Jr. (DD0069)
Law Office of Donald R. Dunn, Jr.
441 East 139th Street
Bronx, New York 10454
Telephone: (718) 570-6321
Email: Donald@drdunnlaw.com

*ATTORNEY FOR PLAINTIFFS*

Plaintiffs, Ilka Rios, Alison Bush, Joyce Culler, Pamela Stewart-Martinez, Winifred Coulton, Sharan Fernandez, Charlene Price, and Roxanne Delgado ("Plaintiffs"), respectfully submit this Memorandum of Law in support of their motion for a preliminary injunction.

## PRELIMINARY STATEMENT

Plaintiffs seek a preliminary injunction enjoining the September 13, 2016 primary election in the Bronx. Plaintiffs must demonstrate: (1) irreparable harm in the absence of injunctive relief; (2) a substantial likelihood of success on the merits; (3) that the balance of the equities favors injunctive relief; and (4) that the public interest is served by a injunctive relief. See, e.g., Ligon v. City of New York, 925 F. Supp. 2d 478, 486 (S.D.N.Y. 2013).

Here, Plaintiffs' substantiated allegations of violations of their Constitutional rights to free speech, equal protection, and due process constitute a finding of irreparable harm -- an injury that money cannot remedy -- sufficient to satisfy the preliminary injunction standard. See, e.g., Jolly v. Coughlin, 76 F.3d 468, 482 (2d Cir.1996) and Statharos v. New York City Taxi and Limousine Comm'n, 198 F.3d 317, 322 (2d Cir.1999); see also Williams v. Rhodes, 393 U.S. 23, 31 (1968) (the right to vote is, itself, a fundamental right). That irreparable harm is the most significant of the four injunction factors. See, e.g., Goldblatt v. Englander Commc'n, L.L.C., 431 F.Supp.2d 420, 424–25 (S.D.N.Y.2006). Further, if Plaintiffs can demonstrate that they are likely to succeed on the merits of their claim, then the balancing of the equities and the public interest in fair elections favor injunctive relief. See, e.g., Ligon, 925 F. Supp. 2d at 541. Accordingly, the applicable test collapses into an analysis of the merits of Plaintiffs' claims.

As set forth in greater detail below, Plaintiffs have substantial, credible, and unrebutted evidence of their claims. Defendants' conduct simply cannot survive the strict scrutiny required of their scheme to disenfranchise Plaintiffs. See, e.g., Dandamudi v. Tisch, 686 F.3d 66, 72 (2d Cir. 2012). Plaintiffs should be granted the injunctive relief they seek.

# STATEMENT OF RELEVANT FACTS

The relevant facts are set forth in the Declarations of Ilka Rios, Alison Bush and Joyce Culler, dated August 13, 2016; in the Declarations of Donald R. Dunn, Jr. ("Dunn Decl."), Sarah K. Steiner ("Steiner Decl."), and Camella Price ("Price Decl."), executed on August 22, 2016, together with the exhibits thereto; and in Plaintiffs' Amended Complaint (Exhibit 5).[1]

### A.  Overview of New York Election Law

By way of background, this case relates to the Designating Petitions filed by the Bronx Democratic County Committee ("County Committee") to place their candidates onto the primary election ballot. Each sheet of a Designating Petition, a creature of Article 6 of the New York Election Law, has three basic parts. At the top are the names and addresses of one or more candidates along with the public position sought. In the middle is a place for qualified voters, i.e., registered in the candidate's party and district, to sign and print their name and to place their address and the date they signed the Designating Petition. At the bottom is the sheet is the subscribing witness statement ("SW Affidavit"), whereby the subscribing witness ("SW") swears under penalty of perjury and that they personally witnessed each voter sign that sheet in their presence on the date indicated. See, e.g., New York Election Law, §§ 6–118, 130, 132, and 134. A signature on a Designating Petition is equivalent to a vote to designate a candidate for party nomination to public office or nominate a candidate for party position. Each voter therefore is allowed to sign only once, and that voter's latter-dated signature on another candidate's Designating Petition will be invalidated upon challenge. See, e.g., Election Law § 134(3).

Of particular relevance here, the public offices and party positions listed on County Committee's Designating Petitions include Member of the County Committee as well as the

---

[1] All exhibit references in this Memorandum of Law are to the exhibits annexed to the Dunn, Steiner, and Price Declarations submitted in support of this motion for a preliminary injunction.

delegates and alternate delegates to the 12th judicial district Democratic convention ("Judicial Delegates"), who select the Democratic candidates for supreme court judges in the Bronx.

A county committee exist pursuant to Article 2 of the Election Law. Each election district ("ED") may elect between two and four members to the county committee. <u>See</u>, <u>e.g.</u>, Election Law § 2-104(1). A county committee must be 25% elected to be legally constituted. <u>See</u>, <u>e.g.</u>, Election Law § 2-104(3). A county committee must meet within 20 days of the primary election to elected officers (Exhibit 8). <u>See</u>, <u>e.g.</u>, Election Law § 2-112. A county committee is responsible for governing the party's affairs in the entire county, including to select the party's entire slate of candidates for every public office, it's official platform and policies, and to fill any vacancies, prepare rules (Exhibit 7), and otherwise govern the affairs of the party. <u>See</u>, <u>e.g.</u>, Election Law §§ 118, 119. A county committee may form other committees to which it delegates authority. The members of a county committee hold that office for two years, until the next primary election. <u>See</u>, <u>e.g.</u>, Election Law § 2-104(4). Each of the Bronx's eleven Assembly Districts("AD") (AD77 through AD87) have at least 60 EDs, so the total composition of the Bronx's County Committee if fully elected is almost 2,400 Members. (Exhibit 6, 2014 County Committee Members; Exhibit 10, 2016 County Committee Members Cover Sheets)

Each primary election season, candidates are allowed to collect signatures on their Designating Petitions sheets during an approximately five week period of time. If a candidate files a Designating Petitions along with a certification that it contains the or exceeds the necessary number of signatures, all signatures are presumptively valid and the board of elections place that candidate onto the primary ballot without any inquiry whatsoever, unless specifically challenged by an "objector" or aggrieved candidate. <u>See</u>, <u>e.g.</u>, Election Law § 6-154(1). An objector is a registered voter who lives in the candidate's district and who files a general objection then a specific, signature-by-signature objection within three and six days,

respectively, of then the challenged Designating Petition is filed.  See, e.g., Election Law § 6-154(3).  Only upon such a challenge will the board of elections conduct a so-called "line by line" review of the challenged Designating Petition.  Even then, the board of elections will not make any determinations about fraud or other non-facial regularity, only validity and sufficiency of signatures. See, e.g., Election Law § 6-154(4).  Any such challenge must be asserted in a 4.5 day special proceeding to be commenced and served within 14 days of the filing of the subject designating petition to determine whether or not to invalidate the Designating Petition of the candidate or candidates specifically challenged. See, e.g., Election Law Article 16.

Finally, it is noteworthy that the challenge process, although theoretically available to all candidates, is in reality a uniformly one-sided proposition. The County Committee candidates, using a stalking horse objector invariably represented by defendant Stanley Schlein, challenge every Designating Petition filed by any opposing candidate, hauling grassroots candidates' friends, family, and neighbors into court to turn every innocent mistake into accusations of fraudulent and criminal conduct.  In the last thirty years, it is believed that County Committee's Designating Petitions have been challenged only twice, a 2014 challenge to County Committee's Designating Petition in the 77th AD (the "2014 AD77 Proceeding") (Exhibit 11, 2014 Transcript) (Exhibit 12, 2014 Referee's Report) (Exhibit 13, 2014 Decision) and a 2016 challenge to County Committee's Designating Petition in the 85th AD (the "2016 AD85 Proceeding") (Exhibit 15, 2016 Transcript) (Exhibit 26, 2016 Referee's Report) (Exhibit 27, 2016 Decision).

Although Plaintiffs were not party to either of those special proceedings, the evidence of Defendants' scheme was uncovered in or as a result of those two special proceedings.  It is respectfully submitted that the transcripts of those proceedings (Exhibit 11, Exhibit 15).

### B. Defendants' conspiracy to unlawfully alter Designating Petitions' candidates

For decades, defendant Stanley Schlein has represented all or virtually all of the Democratic incumbents and other County Committee-endorsed candidates for every elected office in the Bronx (See, e.g., Exhibit 9, 2016 Cover Sheets by AD). This year, however, Michael Blake and J. Gustavo Rivera -- two well respected incumbents in the 79th Assembly District and 33rd Senatorial District, respectively -- retained independent counsel, Sarah Steiner. They were the only two candidates whose name appears on the County Committee's Designating Petitions who retained anyone other than Stanley Schlein. Because they chose to "work outside the system," Blake and Rivera were also the only one of the County Committee's candidates who were bodily excluded from the room where Defendants Schlein, Soto and Perez were binding petitions. Suspicious of such secrecy, and what Bob Ross would describe as a happy little accident, Ms. Steiner made copies of her clients' Designating Petition sheets before handing them over to Schlein and his co-conspirators.

It therefore is certain that Messrs. Blake and Rivera lawfully placed the names and addresses of their candidates for County Committee member onto their Designating Petitions before those petitions were circulated for voters to sign. It is also certain that Defendants unlawfully altered those Designating Petition sheets, after voters had signed them, by adding the names of Defendants' preferred candidates for County Committee Member then filing those fraudulent sheets in the 77th and the 79th ADs. See, e.g., Steiner Decl. and Exhibit 1-4, 28-34.

If Schlein would unlawfully and fraudulently alter the Designating Petitions that were the responsibility of independent counsel representing respected incumbents, of course Schlein would unlawfully and fraudulently alter the Designating Petitions that he was responsible for. Consistent with that expectation, the County Committee's petition gathering process was uniformly described by several SWs and by Angel Gaud, the person who was responsible for

distributing and collecting the County Committee's Designating Petition sheets throughout the Bronx, as a stochastic and unmonitored process.[2] Miraculously, however, every page of every volume of the County Committee's Designating Petitions in 2014 and in 2016[3] are arranged in ascending order by the ED number of the County Committee Member candidates identified on that sheet. With almost metronome-like uniformity, the County Committee's candidates for County Committee Member a sufficient number of sheets, all such candidates have sufficient signatures, and only pages at the end of the volumes retaining a blank box instead of the names of any candidates for County Committee Member. There is a 100% correlation between pagination, the last step before binding, and the ED number of the candidates for County Committee Member named on each sheet. That absolute, orderly correlation results from the County Committee's stochastic, unmonitored petition gathering process only if the page numbers are added simultaneous with the ED number and the names of the candidates for County Committee Member in that ED.

The evidence therefore establishes that the names of the County Committee's candidates for County Committee Member were unlawfully and arbitrarily appointed, without a single voter ever seeing the names of those candidates, much less signing anything to support any such person's candidacy. Further, all of County Committee's candidates for County Committee Member were uncontested. Plaintiffs therefore can prove the foundation of Defendants' unlawful and fraudulent conspiracy to absolutely control the entire composition of the 2,400-

---

[2] In the 2016 AD85th Proceeding, Angel Gaud testified that the blank petition sheets were placed into three piles, corresponding to the three volumes of the 85th AD County Committee Petition. SWs came and took as many blank sheets as they wanted from any one or more of the three piles. None of the SWs were given any particular sheets, no one tracked how many sheets of each type were handed out. He never instructed SWs to obtain more of any particular type of sheet because it had always worked out that they had enough. Both Leila Martinez and John Zacarro, the only two SWs to testify, confirmed Gaud's testimony. When they were distributed to SWs, the blank sheets of any one volume of the 85th AD County Committee Petition were completely fungible. See, e.g., 2016 Transcript (Exhibit 15).

[3] Defendants have destroyed all relevant documents created prior to 2014.

Member County Committee, without the knowledge or consent of a single Bronx voter. Defendants' scheme to appoint rather than petition to designate their hand-picked faithful as the County Committee Members, to leave 1,000 Member positions vacant, and to disappear another 1,000 Members by manufacturing vacancies, reduces the County Committee Meeting to a farce where the limited attendees ready from scripts, no roll call or attendance is kept, quorum is determined by the "eyeball test," and the vote, if any, is an aye or nay voice vote. The entire sham is absolutely controlled by Defendants to give their conspiracy the veneer of democratic participation. Plaintiffs will adduce further evidence at the hearing to illuminate the extent to which the County Committee's Meetings are a sham, but the decision in the Rainbow Rebellion case, Dinowitz v Rivera, 22 Misc.3d 1108(A), 880 N.Y.S.2d 223, 2008 N.Y. Slip Op. 52617(U) (Supreme Court, Bronx County 2008) when read in the context of the Amended Complaint ¶¶ 70-75 (Exhibit 5) is particularly illuminating.

Defendants have used their scheme to divest the County Committee's complete authority into its Executive Committee, and have controlled that corrupt enterprise to dictate the entire slate of candidates to be the Democratic nomination for every public office in the Bronx. In the Bronx, the County Committee candidate almost always runs unopposed in the primary and wins the general election in a land slide. Every Democratic voter who goes to the primary election entitled to rely on the democratically elected, representative County Committee to have selected quality candidates based upon the merits of their public service. Instead, their vote, like the rest of the process, has been debased by Defendants' scheme to a yes or no to the endless slew of unopposed yes-men who cannot loose an election no matter how unpopular they become. Every voter in the Bronx has had their vote diluted to the point of disenfranchisement.

## C. Defendants' conspiracy to unlawfully alter Designating Petitions' dates

Part of Defendants' scheme is to fraudulently back-date the signatures on the County Committee's Designating Petitions, to claim priority over any latter-dated signatures on the petition of an opposing candidate trying to get onto the primary ballot. For example, Julia Jenkins testified concerning the three sheets of the County Committee's Designating Petition filed in 2014 in the 77th AD to which she was the SW. Julia Jenkins plainly testified that the dates on her sheets had been added <u>after</u> she signed the SW Affidavit and that those dates had been fraudulently back-dated to May 29, 2014, the first day of petitioning. <u>See</u>, <u>e.g.</u>, 2014 Transcript (Exhibit 11), 29-40. Those three sheets (Exhibit 14) had the entire date column fraudulently and unlawfully manufactured in a manner calculated to invalidate any latter-dated, duplicate signatures on an opposing candidate's Designating Petition.

That exact same pattern of unlawful manufacture is obvious on the sheets of the County Committee's Designating Petition, filed in 2016 in the 85th AD, to which Leila Martinez was the SW, compared to other sheets in that same volume proved to be otherwise fraudulent (Exhibit 16). Leila Martinez works for defendant Diaz Jr.'s father, is the paramour of Defendants' "cleaner," Angel Gaud, is a member of the County Committee, sat by Schlein's side during much of that 2016 proceeding, and lives with her mother, sister, adult son, and two other adults in the same two-bedroom apartment from which all six vote regularly and religiously (Exhibit 35). Leila Martinez falsely testified that the sheets for which she was the SW were dated either by her or the various signatories to those sheets. Similarly, John Zacarro, the chief of staff of Rafael Salamanca Jr., one of the County Committee's candidates for City Council, perjured himself when he testified that all of the sheets to which he was the SW were dated either by him or the signatory (Exhibit 17). He also perjured himself when he testified that he witnessed the signature of Lisa Wilson on June 15 in front of her apartment. Ms. Wilson was certain she

signed the petition for someone else and on a Saturday, not for Zacarro on a Wednesday, and Zacarro's name does not appear on the security sign-in log for Ms. Wilson's building (Exhibit 18).

### D. Defendants' conspiracy to misappropriate Bronx voters' identities

Most of the candidates appointed by Defendants as Members of the County Committee have no idea that their name is being used as a candidate. They did not ask to be a candidate, were not told they were a candidate, and were placed onto the primary ballot in an ED far from their home, where no one from their church or block or neighborhood garden can see their name on the primary ballot.

Further, the majority of those of the County Committee's supposed candidates for County Committee Member are listed at an incomplete, incorrect, or old address. The statutory notice of their election to the County Committee is therefore sent in a manner calculated not to be received. Defendants' therefore conspire to deprives their victims of any opportunity to attend the County Committee meeting, participate in its deliberations, and have a vote in the Democratic party's candidates and platform in the Bronx. The victims whose identities Defendants misappropriate become manufactured "vacancies" that are supposed to be filled by a majority of the Members of the Vacancy Committee headed by Stanley Schlein and controlled by Defendants.

Table 1. 2014 County Committee Members (Exhibit 6) compared to the records of the Board of Elections in the City of New York.  "----" = analysis not yet complete.

|        | Vacant | Members | address deficiency | also a 2016 candidate |
|--------|--------|---------|--------------------|------------------------|
| 77 AD  | 75     | 95      | 85 (89%)           | -------                |
| 78 AD  | 39     | 95      | 91 (96%)           | ------                 |
| 79 AD  | 124    | 70      | 70 (100%)          | 68                     |
| 80 AD  | 170    | 56      | 46 (82%)           | ------                 |
| 81 AD  | 24     | 291     | ------             | ------                 |
| 82 AD  | 86     | 239     | ------             | ------                 |
| 83 AD  | 29     | 247     | ------             | ------                 |
| 84 AD  | 73     | 123     | 40  (32%)          | ------                 |
| 85 AD  | 85     | 69      | 63 (91%)           | ------                 |
| 86 AD  | 112    | 19      | 19 (100%)          | ------                 |
| 87 AD  | 50     | 141     | ------             | ------                 |
| **TOTAL** | **867** | **1,445** |                  |                        |

Plaintiffs' limited investigation so far has identified dozens of people whose name appears on one of the County Committee's Designating Petitions as a candidate for Member of the County Committee even though they moved out of the Bronx years ago, who are dead, or otherwise have absolutely no idea their identity has been misappropriated by Defendants.  For example, Plaintiffs Rios, Bush, Culler, Fernandez, Price, and Delgado all had their identities misappropriated by Defendants to be used as manufactured vacancies.

In addition, Defendants misappropriated the identity of plaintiff Ms. Coulton, whose signature was forged as the purported subscribing witness to at least one forged petition sheet in the County Committee's Designating Petition filed in 2014 in the 77th AD, BX201400193-225. There is evidence of systemic misappropriation for such fraudulent purposes.  For example, in the County Committee's Designating Petition filed in 2014 in the 77th AD, the most prodigious

11

SW, Nicholas Brown, almost certainly had his identity misappropriated for the purpose of falsely witnessing forged sheets of the County Committee's Designating Petition (Exhibits 21, 22). That same petition contained sheets for which the SW was Angel Molina, who did not actually reside at the 974 Prospect Place address listed on his board of elections records and on his SW Affidavits while he was gathering signatures. The on-site director of the not-for-profit entity that manages that property plainly testified that the books and records of that entity reflect that when Angel Molina supposedly registered at that address in 2012, he had not resided at that property for years. See 2014 Transcript 85-96.

### E. Defendants' conspiracy to forge Bronx voters' signatures

To knowingly solicit and submit invalid, duplicate signatures and represent that they are valid is fraud. Everybody here understood that because no one was ever asked to sign a single sheet twice on two consecutive lines. It does not become any less fraudulent to move that second signature to a different page or volume of the petition.

If a person were knowingly causing the same signature to be placed on multiple sheets of a Designating Petition, it would be unwise to make them identical lists. Creating those duplicates by tracing, from an authentic original or all from a template, would result in sets of sheets containing near-identical lists of voter signatures, such as the three sets referred to as the "Rosetta Stone" sheets (Exhibit 23).

Table 2. The three sets of clever forgeries comprising the Rosetta Stone Sheets (Exhibit 23).

| **Volume-page, Witness** | $\approx$ | **Volume-page, Witness** | $\approx$ | **Volume-page, Witness** |
|---|---|---|---|---|
| BX419-3, Onelis Ramirez | $\approx$ | BX410-47, Helen Jacome | $\approx$ | BX415-2, Yianna Justo |
| BX419-2, Onelis Ramirez | $\approx$ | BX410-46, Helen Jacome | $\approx$ | BX415-1, Yianna Justo |
| BX419-1, Onelis Ramirez | $\approx$ | BX410-45, Yianna Justo | | |

Even when laid side-by-side, the overlap is entirely non-obvious until you remove the non-identical names, then the relationship leaps off of the page.

Table 3. Overlapping signatories to the Rosetta Stone Sheets (Exhibit 23).

| **BX419-3, Onelis Ramirez** | **BX410-47, Helen Jacome** | **BX415-2, Yianna Justo** |
|---|---|---|
| 1.  Yvonne White | 1.  Yvonne White | 2.  Yvonne White |
| 4. Delissa Grigg | 2.  Delissa Grigg | 7.  Delissa Grigg |
| 6. Derrick Brown | 3.  Derrick Brown | 9.  Derrick Brown |
| 8. Rebecca Thornton | 4.  Rebecca Thornton | 12. Rebecca Thornton |
| 9. Brenda Woodie | 5.  Brenda Woodie | 13. Brenda Woodie |
| 10. Joann Richardson | 6.  Joann Richardson | 14. Joann Richardson |
| 11. P. Wilson | 7.  P. Wilson | 15. P. Wilson |
| 13. Santos Perez | 8.  Santos Perez | |
| | | |
| **BX419-2, Onelis Ramirez** | **BX410-46, Helen Jacome** | **BX415-1, Yianna Justo** |
| 1.  Santo Smith | 1.  Santo Smith | 1.  Santo Smith |
| 2.  Randall Ford | 2.  Randall Ford | 2.  Randall Ford |
| 3.  Jose Rivera | 3.  Jose Rivera | 4.  Jose Rivera |
| 4/5. Gwendalyn Henry | 4.  Gwendalyn Henry | 5.  Gwendalyn Henry |
| 6.  Miriam Hernandez | 5.  Miriam Hernandez | 6.  Miriam Hernandez |
| 7.  Joan Brunson-Miller | 6.  Joan Brunson-Miller | 7.  Joan Brunson-Miller |
| 8.  Yolanda Magwood | 7.  Yolanda Magwood | |
| 9.  Alice Williams | 8.  Alice Williams | 8.  Alice Williams |
| 10.  Delano Cargall | 9.  Delano Cargail | 9.  Delano Cargail |
| 11.  Teddy Concepcion | 10.  Teddy Concepcion | 10.  Teddy Concepcion |
| 12.  Regina Jones | 11.  Regina Jones | 11.  Regina Jones |
| 13.  Lloyd Smith | 12.  Lloyd Smith | 12.  Lloyd Smith |
| 14.  Johnnie McCoy | 13.  Johnnie McCoy | 13.  Johnnie McCoy |
| 15.  Verneitha Hawkins | 14.  Verneitha Hawkins | 14.  Verneitha Hawkins |
| | 15.  Alagracia Ramos | 15.  Alagracia Ramos |
| | | |
| **BX419-1, Onelis Ramirez** | **BX410-45, Yianna Justo** | |
| 2. Tamara Frazier | 1. Tamara Frazier | |
| 3.  Marshall Davis | 2.  Marshall Davis | |
| 4. Theresa Moore | 3. Theresa Moore | |
| 5. Quincy Smalls | 4. Quincy Smalls | |
| 6. Maria Lancaster | 5. Maria Lancaster | |
| 7. Catherine Robinson | 6. Catherine Robinson | |
| 8. William Dorsey | 7. William Dorsey | |
| 9. Geneva Holliday | 8. Geneva Holliday | |
| 10. Cynthia Ampox | 9. Cynthia Ampox | |
| 11.  Rebecca Opoku | 10.  Rebecca Opoku | |
| 12.  Rafael Verdeso | 11.  Rafael Verdeso | |

First, although non-identical signatures are interspersed with the overlapping signatures, the relative order of the identical signatures never varies. Instead, two or three SWs purport to have collected the same ten to fifteen signatures in the exact same relative order. It is highly improbable that multiple SWs all started at the same floor and moved through the building in the same order. Second, this is not an attempt by SWs to disguise their efforts to obtain duplicate signatures, because the relative order of identical signatures would change as the SWs hopped about the building in different order to avoid detection. Third, the dates on these sheets were obviously manufactured in the same unlawful, fraudulent process described above. That indicia of fraud is confirmed by the testimony of Yvonne White that she did not sign any of the three Rosetta Stone Sheets (BX415-2 line 2, 419-3 line 1, and 410-47 line 1) upon which her name and purported signatures appear. The Rosetta Stone Sheets are, in fact, artful forgeries.

The evidence demonstrates that numerous sheets from the County Committee's Designating were manufactured by tracing in the following manner: (1) create template lists of forged signature lines from the BOE's records; (2) trace signatures from those templates onto one or more petition sheets in different volumes of a given AD's petition, leaving open signature lines, particularly on the first and last line; (3) fill in the lines left open on the forged sheets by tracing from a different template sheet; and (4) date all signature lines then sign SWS.

That process of manufacture by tracing generates artful forgeries likely to avoid detection and withstand scrutiny. Of course, after manufacturing a few hundred petition sheets, even a diligent and motivated forger will eventually make mistakes. Those mistakes create irregular sheets that further evidence the scope and mechanics of the forgery and fraud that permeates the 85th AD County Committee Petition. For example, when adding column after column of the same date to page after page of forgeries, the forger(s) might mistakenly write that date above the first signature line or below the last signature line (see, e.g., BX419-45, an extra date above

first signature line), or forget to write that date on a signature line (see, e.g., BX415-47, a Rosetta Stone Sheets with an undated first signature line).  Or, after the first round of tracing, when the forger(s) adds additional forged signatures, the forger(s) might not notice that one or more of the stack of forgeries is turned in a different orientation and write the signature line upside down (see, e.g., BX415-74, signature and address on last line written upside down).  BX419-45, BX415-47, and BX415-74 were filed by the County Committee in 2016 in the 85th AD and are annexed as Exhibit 24.

Then there is BX400-203.  The signatures and addresses of lines 12 through 15 are written upside down but the rest of the signatures and all of the dates are in the correct orientation; and BX400-221, where the signatures and addresses of lines 2 through 15 are written upside down but the rest of the sheet is in the correct orientation.  BX400-203 and BX400-221 (the "Inverted Signature Block Sheets") were filed by the County Committee in 2016 in the 87th AD are annexed as Exhibit 25.

### F. <u>Defendants' conspiracy to tamper with witnesses</u>

The accompanying Price Declaration establishes that defendant Benny Catala, acting further to Defendants' conspiracy, threatened Rosella Gregg to induce her to commit perjury. She did perjure herself and was rewarded with a seat as a County Committee member when her name and the names of her three other people purportedly all living in her apartment with her were unlawfully placed onto the County Committee's Designating Petition sheets in the 77th AD (Exhibits 2-4).

**ARGUMENT**

In light of that evidence, even a cursory review of the Amended Complaint (Exhibit 5) demonstrates that Plaintiffs are substantially likely to succeed on the merits of their claims.

First, voting on public policy matters coming before a legislative body is an exercise of expression long protected by the First Amendment. See, e.g., Colson v. Grohman, 174 F.3d 498, 506 (5th Cir.1999). As the Supreme Court observed in Bond v. Floyd, 385 U.S. 116, 135–36, 87 S.Ct. 339, 17 L.Ed.2d 235 (1966), "[t]he manifest function of the First Amendment in a representative government requires that legislators be given the widest latitude to express their views on issues of policy." Camacho v. Brandon, 317 F.3d 153, 160 (2d Cir. 2003). Plaintiffs who were elected as Members of County Committee but deprived of their right to attend, participate, and vote at that Meeting, all violations of their "core political speech" because it involves interactive communication concerning political change. See, e.g., Meyer v. Grant, 486 U.S. 414, 422, 108 S.Ct. 1886, 100 L.Ed.2d 425 (1988); accord Buckley v. Am. Constitutional Law Found., 525 U.S. 182, 119 S.Ct. 636, 142 L.Ed.2d 599 (1999) ("Buckley").

Second, it is well established that "the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise," in violation of the Equal Protection clause Reynolds v. Sims, 377 U.S. 533, 554–55, 84 S. Ct. 1362, 1378, 12 L. Ed. 2d 506 (1964). See also Williams v. Rhodes, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968) (holding unconstitutional a practice or policy that gives one party a decided advantage over another, thereby denying voters the right to "cast their votes effectively"). Where, as in the Bronx, the state law "has made the primary an integral part of the procedure of choice, or where in fact the primary effectively controls the choice, the right of the elector to have his ballot counted at the primary, is likewise included in the right protected by Article I, s 2. And this right of participation is protected just as is the right to vote at the

election, where the primary is by law made an integral part of the election machinery, whether the voter exercises his right in a party primary which invariably, sometimes or never determines the ultimate choice of the representative." United States v. Classic, 313 U.S. 299, 318, 61 S. Ct. 1031, 1039, 85 L. Ed. 1368 (1941). Further, "the power to influence the political process is not limited to winning elections. An individual or a group of individuals who votes for a losing candidate is usually deemed to be adequately represented by the winning candidate and to have as much opportunity to influence that candidate as other voters in the district." Davis v. Bandemer, 478 U.S. 109, 131–32, 106 S. Ct. 2797, 2810, 92 L. Ed. 2d 85 (1986). Because of Defendants' scheme, no Bronx voters have had a say in their local government for years or decades.

Third, Defendants' scheme is arbitrary, conscience-shocking, and oppressive in a constitutional sense, has rendered elections in the Bronx pervasively and systemically unfair in an outrageous manner that violates the substantive Due Process clause. See, e.g., Lowrance v. Achtyl, 20 F.3d 529, 537 (2d Cir.1994). Defendants' willful conduct has undermined the "'organic processes' by which candidates or positions are selected," in violation of Plaintiffs' rights to Due Process. Molinari v. Bloomberg, 596 F. Supp. 2d 546, 567 (E.D.N.Y.), aff'd, 564 F.3d 587 (2d Cir. 2009), quoting Shannon v. Jacobowitz, 394 F.3d 90, 96 (2d Cir.2005) (collecting cases); Nolles v. State Comm. for the Reorg. of Sch. Dists., 524 F.3d 892, 898–99 (8th Cir.2008) (collecting cases). The effects of Defendants' conduct is so far-reaching, and the availability of any state law remedy so inadequate, as to necessitate a federal court's interference.

Finally, the overwhelming majority of Defendants' victims are poor persons of color. The County Committee and the Bronx's primary election are an indispensible part of the New York's election machinery, and it is a violation of Plaintiffs' constitutional and statutory rights as qualified voters to be excluded from those processes by reason of race or color. See, e.g., Elmore

17

v. Rice, 72 F.Supp. 516, aff'd 165 F.2d 387, certiorari denied 68 S.Ct. 905, 333 U.S. 875, 92 L.Ed. 1151 (E.D.S.C.1947); United States by Clark v. Democratic Executive Committee of Barbour County, Ala., 288 F.Supp. 943 (M.D.Ala.1968); Thornburg v. Gingles, 478 U.S. 30, 47–48, 106 S. Ct. 2752, 2764–65, 92 L. Ed. 2d 25 (U.S. 1986) (where an "electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives," the Voting Rights Act is violated and injunctive relief is appropriate.) Injunctive relief to prevent discrimination in elections is not confined to named individual voter officials, but extends as far as sovereign state itself. Kennedy v. Lynd, 306 F.2d 222, (5th Cir. 1962), certiorari denied 83 S.Ct. 507, 371 U.S. 952, 9 L.Ed.2d 500 .

## **CONCLUSION**

For all of the foregoing reasons, and for the reasons set forth in the accompanying Declaration and the Amended Complaint, the Court should grant Plaintiffs' motion for a preliminary injunction and award Plaintiffs such other and further relief as is just and proper.

Dated: Bronx, New York
August 24, 2016

                                        LAW OFFICE OF DONALD R. DUNN, JR.

                                        By: _____/S/_____
                                             Donald R. Dunn, Jr. (DD0069)

                                        441 East 139th Street
                                        Bronx, New York 10454
                                        718-570-6321
                                        Donald@drdunnlaw.com

                                        Attorney for Plaintiffs