1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  ILKA RIOS, et al.,

4               Plaintiffs,

5          v.                          16 Civ. 6448 KMW

6  STANLEY KALMON SHLEIN, et al.,

7               Defendants.

8  ------------------------------x

9

10

11                                     September 6, 2016
                                       2:20 p.m.
12

13

14

15

16  Before:

17                    HON. KIMBA M. WOOD,

18                                     District Judge

19

20

21

22

23

24

25

1          (In open court)

2          (Case called)

3          THE COURT:  The briefing here has been all over the

4    lot and has made it difficult for me to get a good fix on what

5    the appropriate analysis is.  I don't fault counsel for that.

6    I take it you were all operating under the gun and didn't have

7    much time to put the papers together.  I'd like to allow

8    everyone at least 10 minutes to speak, but I'd like to begin by

9    giving you my tentative conclusions.

10          First, I think it is clear that a political party,

11   acting as the defendant has done here, the defendant party, is

12   a state actor; that is, is acting under color of state law.

13   That is a principle that has been affirmed time and again by

14   the Supreme Court as well as by a recent very good decision

15   from the Eastern District of New York.

16          I think that the primary question then becomes under

17   Rivera Powell, whether there is an adequate state remedy.  I

18   know that in the past, the state court remedies have been used

19   and have at least in 2000, many petitions were thrown out after

20   having been challenged with respect to John McCain, Steve

21   Forbes and even George Bush.

22          This is obviously not a new problem in New York.  One

23   opinion stated that candidates try to get six times the number

24   of signatures they need because so many signatures will be

25   challenged.  So it is assumed that many challenges will be

1    successful.  I don't know enough now to know whether the remedy

2    in the state is adequate.  I don't know at what point a state

3    referee or court will have amassed enough evidence of

4    wrongdoing that the wrongdoing could be deemed pervasive.  I am

5    not sure you'd have to go to a thousand entities to find that

6    out.  I think some number short of that could result in a

7    finding of pervasiveness.

8            This is clearly a very serious problem.  It is not one

9    that I can remedy now on the state of the current record.

10   There is simply not sufficient evidence of irreparable harm,

11   and I have in mind that I can require a separate election.  I

12   would be prepared to do so if the evidence before me suffices.

13           I would like to have a much better understanding than

14   I have now of the history of wrongdoing here.  Plaintiffs have

15   given me some information from 2014, but these sorts of things

16   have been going on much longer than that, and it seems to me

17   odd that the state has a remedy that gives too little time and

18   requires too many people to be effective if that, in fact, is

19   the case.

20           In any event, my tentative view is that irreparable

21   harm has not been shown and it is something I can repair down

22   the road.  I'd be glad to hear anyone who would like to speak,

23   beginning with Mr. Dunn.  I will take you in the order that you

24   appear on my appearance sheet.

25           MR. DUNN:  Thank you.

1              THE COURT:  Mr. Dunn.

2              MR. DUNN:  Thank you very much, your Honor.

3              First of all, I apologize to the extent that my papers

4     in the first instance were hardly a model of clarity, but as

5     your Honor notes, we all did the best we could with the time we

6     had.  I would like to just address a couple of highlights, your

7     Honor.

8              First of all, if your Honor would like, I would be

9     happy to give a bit of an overview of the petition process that

10    is implicated here as well as the challenge process that is

11    implicated in the state court system.

12             THE COURT:  I think your papers have educated me on

13    that.  Where I am somewhat unclear is, for example, what harm,

14    what injury is suffered by a person whose name is placed on a

15    petition and who doesn't know that his or her name has been

16    placed on the petition.

17             MR. DUNN:  Yes, your Honor.

18             First of all, we are talking about the people whose

19    names are placed on the petition for the party position of

20    member of the county committee.  On the county committee's

21    petition sheets -- this is a blank one I have obtained -- there

22    is all these folks running for all these offices, and this is

23    the county committee position right here with blank spaces to

24    be filled in with the various 2400 or so different positions to

25    be filled.

1          In terms of the history of wrongdoing, your Honor, I

2    wish I was in a better position to have more information but,

3    unfortunately, we don't.  There have been two relevant

4    challenges that I have information about to any designated

5    petition filed by the county committee, and that was the one in

6    2014.

7                THE COURT:  I have read that.

8                MR. DUNN:  Mack versus Joiner, yes, and 2016 Cepeda.

9                THE COURT:  I read that.

10               MR. DUNN:  Yes.  In each instance, what was before the

11   special referee and the court was a very narrow issue.  In Mack

12   versus Joiner, it was whether or not that petition was

13   sufficient to be validated.

14               THE COURT:  I understand that those are highly

15   distinguishable from our case for those reasons.

16               MR. DUNN:  Yes.  In the 2014 case, your Honor, I think

17   we have to distinguish throughout this entire analysis the

18   usual flotsam of sharp elbows, if you will, or wrongdoing in

19   connection with election or voting for which we simply have to

20   trust that the state court system will in the long run take

21   care of these garden variety sort of irregularities.

22          I argue there is evidence now in hindsight that seems

23   to implicate more central issues that is what in evidence of

24   2014, a flotsam of forged signatures, affidavits not actually

25   witnessing the particular people sign the petition sheets.  In

1    that case, we were able to invalidate 40 or 50 percent of the

2    signatures.  Both the referee and the Court Appellate Division

3    said there was fraud, but not enough to invalidate.  It was

4    essentially a non-event.

5          In 2016, there was evidence that implicated the order

6    in which these petitions were bound in a way that brought the

7    names of the county committee members to bear.  That

8    information, that evidence was uncovered for the first time on

9    August 9th, afternoon of August 9th.

10          THE COURT:  It would help if you would explain to me

11    why the order mattered.

12          MR. DUNN:  Yes.  You can imagine you end up with

13    anywhere from 2 to 200 of these sheets that are bound in a

14    volume, and when you look through the volumes bound by the

15    committee, they aren't arranged in any discernable order.  It

16    is not arranged by the date on which the signatures were

17    collected or as the witness or location or anything other than

18    two things.

19          Number one, it is paginated.  You see these blank

20    sheets have a sheet number and a blank.  So at the very end

21    someone writes 1, 2, 3, et cetera.  It is paginated 1 through

22    whatever.

23          The other way in which they're organized, they're in

24    ascending order by the election district of the members of the

25    county committee.  So, for example, your Honor, let's say that

1    this were filled in with John Doe, Jane Doe, and this was the

2    first election district, okay?

3            In Volume 415, for example, the first four sheets are

4    for the first election district.  The next four sheets are for

5    the second election district.  The following four are for the

6    third.  There is a 100 percent correlation between the

7    ascending election district order, although they're skipped, 1,

8    2, 3, 5, 7, 11, not always consecutive, but always in ascending

9    order, core receipts 100 percent with --

10           THE COURT:  I am missing a building block here.  Why

11   wouldn't whoever is putting them together put them together in

12   some order?

13           MR. DUNN:  Well, I wouldn't speculate on that other

14   than to say the fact that they end up in order by page number

15   and by election district means one of two things:

16           It means those things were done at the same time.  So

17   either someone takes a big stack and puts them in order of

18   election district, or someone adds the election districts at

19   the end as they're going through.

20           THE COURT:  It could be one or the other?

21           MR. DUNN:  It could be based on simple observation

22   there is a correlation, or one or the other.  Some of the

23   testimony adduced in the 2016 challenge elucidated that issue,

24   subscribing witnesses testified there were various piles of

25   these sheets, they could take whichever one they wanted.

1           They didn't carefully track how many went out or came

2   back in.  The subscribing witnesses, the volunteers who carried

3   these things around and the people who testified he was

4   primarily responsible for summing that process testified that

5   there was never a time when people said you have to get more of

6   this person's petition or that person's petition or this type

7   or that type.  It always just worked out was the testimony.

8           So the question then becomes well, if no one is paying

9   any attention, how come, how is it they end up in this order by

10  election district?  It seems less probable, all things being

11  equal, that as between the names at the end or they put into

12  order.  If you end up with an exact regular distribution of

13  these things, that happens only if they're added at the very

14  end.  The referee --

15          THE COURT:  I don't want to waste all your time having

16  you educate me on this, but I still don't understand.  Can't

17  someone do this at one time?

18          MR. DUNN:  They could do this at one time.

19          If I had 60 different people taking three different

20  piles from a table, and I didn't pay attention to who took what

21  or when or when they all came back, and there was some random

22  arrangement of election districts, maybe one or two or

23  scattered, there is any number of ways you could arrange them.

24          However they're arranged, they go out, they come back

25  in.  If the stickers are on, as they must be, the names of

1   these candidates must be on in order to sign.  I can't ask you

2   to sign for Mr. Pachardo and cross it over and write Donald

3   Duck.  That is clearly unlawful.  If this is to be done

4   lawfully, the name of county committee candidates must be on

5   the petition before the voters sign, whether it is a sticker,

6   typed, et cetera.

7           In this random process of going out and coming in, not

8   everybody brings their petitions back, some of them end up

9   being improper and so they can't be used, it seems improbable

10  with that statistic, unmonitored process, you end up with a

11  result of four for the first election district and four for

12  second and four for the third.  I agree it is a non-obvious

13  point and not dispositive in and of itself.  Whatever you may

14  think of the strength of that evidence, the referee found it

15  was not relevant to the 2016 proceeding.

16          That was on the 9th of August.  At the exact same

17  time, the referee declined to hear the testimony of Ms. Bush,

18  who is one of these members whose identities was being taken.

19  When the referee issued a report the next day and appeared

20  before the Supreme Court, Justice Carter, I argued that

21  evidence should have come in.

22          It was one of the things listed in the verified

23  position, Page 6 of that petition incorporated by reference in

24  the offer of proof.  One way or the other, the judge disagreed,

25  and the judge's decision, as your Honor saw, is it was outside

1    of the scope of the proceeding.  That was on the 12th of

2    August.

3           We came to court on the 15th, Monday, and filed the

4    order to show cause, which is the Exhibit 42 to the

5    supplemental papers, and got this briefing schedule.  It was

6    after we filed that document that we really uncovered the most

7    compelling evidence of unlawful alteration, and that is

8    Exhibits 1 through 4.

9           Ms. Steiner's declaration, Exhibits 28 through 32, and

10   the additional four exhibits to the supplemental papers, which

11   are Exhibits 37, 38, 39 and 40, in each of those instances what

12   you see is that Ms. Steiner made a copy of the designated

13   petition sheets that are reflected by her -- on behalf of her

14   clients.  In each instance, she made sure they were prepared

15   lawfully, including the names of the candidates were on

16   beforehand and made a copy, turned it over to defendants, and

17   when you you compare the copy she made after the voter signs to

18   what was filed, you find alterations in each of those 16

19   instances.  Even one of those alterations is an unlawful,

20   fraudulent act.

21          THE COURT:  Assuming that, where does it take us in

22   terms of pervasiveness?

23          MR. DUNN:  In terms of pervasiveness, if you look at

24   Exhibit 6, for example, to the papers, the 2014 list of members

25   on the county committee by ascending district, by my math,

1    there were about 14, 1500 names identified and a little less

2    than a thousand vacancies.  There was a different count by some

3    of the defendants, but not significant, not statistically

4    significant.  Let's say a thousand and 1500 vacancies and real

5    names.

6         We find that in several of these ascending districts,

7    the pattern of incomplete addresses is near 100 percent.  It is

8    one of the tables that is set forth in the memorandum of law.

9    By incomplete or incorrect, most commonly the address has a

10   wrong zip code or has a missing apartment number, and most of

11   these folks live in multiple dwellings, and so if you live in

12   the 200, 200 building without an apartment number, you don't

13   get your mail.  Because of that high rate of incorrect

14   addresses, I suspect it is extraordinarily pervasive.  There

15   are three reasons I think it is pervasive:

16        One is the high rate of incorrect addresses;

17        Number two, we have been able to reach out to 30

18   people.  By "we," I mean me and a couple of volunteers that

19   were able to give their time in the last couple of weeks.  As

20   you see in the table of folks we have identified, there are 15

21   people who are willing to come forward and want to join as a

22   plaintiff.  We have a total of more than 30 names of people who

23   are elected as members of the county committee who knew nothing

24   about it, who were dead, et cetera;

25        The third reasoning, and I think is it is pervasive, I

1    have seen video and still photos of the 2014 county committee

2    meeting, and the statute says it has to be 25 percent elected,

3    and by my count, based on still photos I can see, there is

4    nowhere near the statutory requirement of 600 people.  Based on

5    the number of folks I see there, I suspect that it really is

6    1500 people, about a thousand or some of those folks

7    disappeared.

8           What that is telling to me, most telling is the way

9    that I find people who have been used in this way, I go through

10   this 2014 list, and your copy is as filed, but we sat down --

11   this is blue ink.  We write down where the apartment number is

12   missing.  Some people have known numbers, so we knock on the

13   door or make a phone call.  I found one person who knew nothing

14   about his name being used, Johnson, Abdul Johnson.

15          THE COURT:  How was he hurt by not knowing his name

16   was there?

17          MR. DUNN:  He wasn't hurt because he did know.

18          THE COURT:  He did know?

19          MR. DUNN:  He did.  He is one of the people recently

20   added in the 79 assembly district by Mr. Blake, the new

21   candidate who is the incumbent whose attorney made these

22   copies.

23          In any event, I found one person, Mr. Johnson.  He

24   said yeah, I remember two women from my church came and asked

25   me something about it.  He didn't know exactly, but he knew

1    well enough.  I told him I don't think there is anything

2    nefarious.  Every other person I reached on the phone doesn't

3    know anything about this.

4              THE COURT:  What I started asking you, how were those

5    people hurt?

6              MR. DUNN:  Yes.  So if I am elected as a member of the

7    county committee pursuant to the Articles of Election, then I

8    have the right to get notice of the meeting, and during the

9    two-year term of the county committee I am an elected member, I

10   have the right to attend meetings, participate in discussions

11   and to vote.

12             THE COURT:  So you've lost those rights, you're

13   saying?

14             MR. DUNN:  That is exactly right.  Those are the

15   direct First Amendment claims, all right.  Less obvious are the

16   fact each of these plaintiffs whose identies were misused in

17   this way, almost none of them run for office in the election

18   district in which they live.  They were put on the ballot in an

19   election district -- (inaudible) -- no one would see the name

20   and give notice.

21             A person simultaneously has their rights to the core

22   political free speech rights taken when they're deprived of

23   notice of the meeting and opportunity to vote and attend.

24   They're also deprived of their indirect First Amendment equal

25   protection rights when the person who is supposed to be

1   representing them has the same thing happen to them and their

2   voice is taken in that same way.

3           That is a derivative claim and puts Rivera Powell in

4   the way the district First Amendment claim does not.  Rivera

5   Powell stands for the proposition that you have a protected

6   First Amendment right as voter to have your candidate of choice

7   be treated fairly.  What Rivera Powell has seen, the voter has

8   a distinct claim, there is no additional burden on the voters'

9   rights if their candidate of choice is given adequate due

10  process.  That is not implicated where it is the First

11  Amendment right of the person themselves that is being directly

12  taken, as in the case of someone elected as a member.

13          Secondly, as I set forth in the supplemental papers,

14  we don't think that the process at the state level even

15  contemplates something of this nature.  It doesn't provide any

16  meaningful opportunity for this even to be heard.

17          First of all, if I wanted to challenge any aspect of

18  this in the state court proceeding, as was pointed out in some

19  of the opposition papers, I would have to have even either been

20  a green candidate, so I would have to be running for the

21  committee if my signature is filed on the ballot, or I would

22  have to be an objector, which is a voter that lives in the

23  district and files paperwork, general objections, specification

24  objections, but you have to be a voter in that particular

25  territory --

1          THE COURT:  I know.

2          MR. DUNN:  -- just one election district.

3          And you would have standing if you did that to

4   commence a special proceeding, but if it is with respect to the

5   petition, the designated petition, these green sheets, the

6   issue is whether they're valid or not.  If you look at the

7   provisions of the election, they talk about primary elections.

8   You say look, why don't you let the primary happen and come

9   back and bring this to the state court's attention.

10          If you look at the two provisions of the election in

11  particular that discuss the primary election, relief available,

12  you have the statute saying that where you are attacking a

13  primary election or a meeting of state committee or county

14  committee, you have to be in court within 10 days.

15          The next section, Section 3, says the court can give

16  this relief with respect to a primary, this relief with respect

17  to a caucus, but there is nothing specified for the relief they

18  can give you with respect to a county committee.  If I want to

19  challenge in state court the designated petitions, first of

20  all, it is too late.

21          Secondly, even if it were too late, I -- I don't know

22  what the threshold would be, I would hope at some point if I

23  had 600 people, there would be a threshold.  Nevertheless, if I

24  had 600 different objectors and 600 specials, the issue is

25  whether those 600 are valid or not.

1          If I want to attack the primary election to get at the

2     primary committee, the corrupt enterprise, again there are the

3     extreme limitations of time and there is a limitation on the

4     relief that is provided under 16102 of the election law with

5     respect to relief directed at the state committee or county

6     committee.

7          THE COURT:  Thank you.  I should allow others to be

8     heard.  Does Ms. Soto to wish to be heard?

9          MS. SOTO:  Yes, your Honor.

10          I would first like to state our -- rather, if I could

11     request a little clarification from the court.  Would you like

12     us just to specifically address the irreparable harm  issue or

13     should we address all elements?

14          THE COURT:  It would be most helpful if you have

15     anything illuminating on irreparable harm.

16          MS. SOTO:  I am still lightly confused as to what the

17     plaintiff's claim is in terms of the irreparable harm.  In my

18     mind, the irreparable harm really is to the over 400,000

19     enrolled, registered Bronx democratic voters who would be

20     basically precluded from exercising their franchise next week,

21     on September 13th, in deciding which candidates will be

22     selected in the contested primaries, who will go forward in the

23     general election representing the Democratic Party.

24          These individual voters will not have an ample

25     opportunity in order to learn about this.  The primary

1    scheduled for September 13th, I think they would suffer an

2    irreparable harm both in their faith in the system and to their

3    own First Amendment rights in terms of freedom of association

4    and freedom of speech in exercising their vote.

5             In connection with the plaintiffs who allege their

6    names appear on the ballot without their consent, and some

7    speculative harm that their First Amendment rights would be

8    denied, they haven't shown that that would be the case.  The

9    meeting that they are saying they would not be allowed to speak

10   in has not occurred.  It occurred within a certain period of

11   time after the primary election.

12            In terms of whether or not they would receive notice,

13   it is clearly an assumption they're making they would not

14   receive proper notice.  It is not required under New York State

15   election law for petitions to include apartment numbers.  As a

16   matter of fact, many candidates often run using just their

17   building number even though some of those candidates might live

18   in private homes, some might live in large buildings.

19            The notices the Bronx Democratic County Committee

20   sends out in order to alert county committee members of the

21   meeting, those don't necessarily have to follow the addresses

22   that are included on the petitions.  These people have been put

23   on the petitions, and similarly, as Mr. Dunn has found them, we

24   similarly might have access to that information.

25            If they choose to attend, they can attend and vote and

1    participate in whatever manner they see representative of their

2    First Amendment rights.  These candidates who might appear on

3    the ballot and be elected because their positions are not

4    contested would fully be able to participate in the meeting.  I

5    haven't seen anything to show that that would not be permitted

6    or that if the primary is allowed to go forward, their

7    participation would be in any way foreclosed.

8           In addition, in connection with the inclusion of

9    people using wrong addresses, et cetera, while there is a

10   presumption of validity to designated petitions that are

11   submitted to the Board of Elections, that presumption of

12   validity does not relate to the candidates that are listed, and

13   there is a review that is done by the Board of Elections in

14   terms of the candidates.  That review includes whether the

15   candidate is actually an enrolled voter within that party and

16   it also includes whether they're enrolled at that particular

17   address, whether their name is correct, et cetera.

18          So, for instance, this year there were 360 county

19   committee members that were included on the designated

20   petitions who were disqualified based on the Board of Election

21   review.  That was due to a multitude of issues.  Some also

22   include incorrect addresses.

23          The fact that some of these errors occur I do not see

24   as being in any way indicative of a nefarious intent or any

25   gamesmanship.  The county committee is comprised of over a

1  thousand members.  If the primary is allowed to go forward,

2  there will be, I believe, approximately -- I believe there will

3  be approximately 1,367 county committee members elected through

4  that primary.  There may be some errors and updates not made to

5  the file.  To me, I don't see it as being in any way an

6  indication that there is a larger scheme.

7      In addition, in terms of how the county committee

8  works, in the event there are vacancies, it is permitted that

9  the county committee can fill those vacancies based on a

10 majority vote or if the vacancy is known beforehand by the

11 committee appointed to fill vacancies.

12      However, the Bronx Democratic County Committee has not

13 filled vacancies that exist in this way for over a decade, and

14 these vacancies do not in any way invalidate the county

15 committee from going forward.  Therefore, Mr. Dunn's premise

16 there is some game in manufacturing these vacancies or in

17 presenting potential candidates that won't participate, really

18 it does not bear any kind of scrutiny when it is applied to

19 reality because in the event these people are not participating

20 or in the event those positions were left vacant, those

21 positions would just left vacant.  As Mr. Dunn's exhibits show,

22 in the current county committee composition, there are a number

23 of vacancies.  Just so long as we make the 25 percent

24 threshold, the additional vacancies don't really impact how the

25 county committee conducts themselves.

1       Before I depart, there are fundamental

2   misunderstandings about the role of the county committee.  In

3   mr. Dunn's papers he alludes to a number of times to county

4   committee selecting candidates to enforce and multiple meetings

5   that are held where the county committee takes positions and

6   selects a platform.  These are not roles of the county

7   committee in the Bronx.

8       The county committee in the Bronx is convened pursuant

9   to the New York State Election Law pursuant to the time

10  allotted after they're elected, and they elect the executive

11  committee and then that is the extent of the county committee's

12  role.  The county committee does not endorse any candidates.

13  The county committee does not circulate any petitions.  Any

14  petitions that are circulated, are circulated by respective

15  candidates seeking respective office or party positions.

16      Therefore, I think based on a number of these

17  different factual errors being considered as well as legal

18  errors being considered together, I don't really see how

19  plaintiffs can meet the irreparable harm or, for that matter,

20  the likelihood of success on the merits, public interest or

21  balance of the equities prong.

22      THE COURT:  Ms. Lally.

23      MS. LALLY:  Thank you.

24      Your Honor, the state board does not collect or review

25  designating petitions.  It is not involved in the composition

1    of primary ballots.  The complaint seeks no relief as against

2    the state board.  Plaintiffs don't allege the state board

3    committed any wrongful act whatsoever.

4            THE COURT:  I understand that and that you're here

5    simply in the interests, in other interests of the state.

6            MS. LALLY:  Correct.  Your Honor, we oppose the PI

7    because the requested relief would cause severe disruption to

8    the state's electoral process.  Courts have repeatedly

9    cautioned about the need to avoid such disruption particularly

10   close to an election.  Plaintiff's proposals, I submit, are

11   just simply not workable.

12           Plaintiff doesn't explain how collecting a mere 25

13   signatures to permit a democratic candidate to go on a general

14   election ballot would in any way be something that would assist

15   in any sort of election process..  He doesn't describe how

16   replacing the entire Bronx judiciary would help any resident of

17   the Bronx whatsoever, and the requested relief would affect a

18   number of candidates simply not present today who can't be

19   heard.  It would affect the general election.

20           In fact, it would enjoin valid New York statutes, but

21   plaintiff has no allegations whatsoever that any of the

22   statutes are unconstitutional.  There is no facial or

23   as-applied challenge to the statute.  Rather, he claims that

24   certain individuals collected signatures improperly.  We submit

25   that the remedy for that is nowhere near the sweeping relief

1    plaintiff seeks in the preliminary injunction.

2         Unless the court has any specific questions?

3         THE COURT:  I don't.  Thank you very much.

4         Mr. Arz.

5         MR. SCHNITTMAN:  Yes, your Honor.

6         I will be brief since I think all of our arguments as

7    seen in our papers are similarly to what the state said, so I

8    don't feel the need to repeat them here.  Just I think it is

9    clear under Section 16-1023 of the New York election laws,

10   something your Honor noted earlier, that if these allegations

11   are to be coordinated by the court, the court can order

12   reholding of the primary.  Because of that, there is no

13   irreparable harm and the preliminary injunction shouldn't

14   issue.

15        THE COURT:  Who else would be like to be heard?

16        Hearing none, I hereby deny the motion for preliminary

17   injunction because I find that plaintiffs have not shown that

18   they will suffer irreparable harm by denying the injunction.  I

19   have the power to order a new election and will do so if the

20   evidence shows that that is required.

21        What I do need from here on out is very good briefing,

22   very clear affidavits and careful attention to the law.  I

23   haven't gone into the Voting Rights Act, but I note that I

24   don't think plaintiffs have shown any basis for a Voting Rights

25   Act claim.  There is no argument that there is any inequality

1    of people of color to choose their representatives.

2          With respect to RICO, there are only intangible claims

3    of damage, not specified amounts of damage, so I think careful

4    work needs to be done before asserting claims like that.

5          I do think that on the defense side, contending that

6    the actions of the party were not taken under color of law is

7    simply not defensible given the state of the law.  I would urge

8    counsel to watch out for Rule 11 violations in that regard.

9          All right.  Thank you very much.

10          We are adjourned.

11          MR. DUNN:  If I may just very briefly.

12          I had filed, in an attempt to accommodate many of the

13    very legitimate observations by the boards of elections, an

14    amended proposed order to show cause.  I won't revisit any of

15    the substantive issues in light of your Honor's issues, but a

16    few points need to be address.  If your Honor has a copy of it

17    in front of you?  If not, I can have it handed up.

18          THE COURT:  I don't.  If you could hand it to my law

19    clerk.

20          (Pause)

21          MS. SOTO:  Your Honor, if I may?

22          THE COURT:  Yes.

23          MS. SOTO:  I think maybe there is a source of

24    confusion on my part perhaps.  In looking at the first amended

25    complaint that was filed, it was my understanding that we were

1    all listed as individuals and that the actual political party

2    was removed as a defendant.  So my pleading and my legal

3    arguments were in connection with us being named as defendants

4    on an individual basis.

5              MR. DUNN:  That's correct.

6              MS. SOTO:  And it is not, in fact, the Bronx

7    Democratic Committee or the executive committee that is a

8    defendant.

9              THE COURT:  But those acting on its behalf.

10             MR. DUNN:  Yes.

11             MS. SOTO:  Sorry?  What?

12             THE COURT:  Individuals acting on behalf of the party.

13             MS. SOTO:  Thank your Honor.

14             THE COURT:  So it is a distinction without a

15   difference, although I agree the words are different, okay?

16             MR. DUNN:  With respect to No. 1, your Honor, it is

17   vitally important that we be allowed to continue to gather

18   evidence.  One of the principal sources of evidence are

19   designated petitions are kept at the Bronx Board of Elections.

20             THE COURT:  It is my understanding these are being

21   made available to you in the presence of your adversaries.

22             MR. DUNN:  That adversaries don't need to be there?

23             THE COURT:  They want to be there.

24             MR. DUNN:  They can, that is exactly right.  The

25   problem is the 2014 petitions are due to be shredded, and the

1  only reason, as I understand it, they have not been shredded is

2  because of the TRO that directed them to preserve them.

3         THE COURT:  Let me ask if there is a stipulation to

4  maintain those 2014 records?

5         MR. RICHMAN:  On behalf of the board, your Honor, if

6  the Court so directs, we will maintain them.  The statute

7  provides a normal two-year-retention period.  We are engaging

8  in conducting an election.  We wouldn't get around do doing

9  this until sometime next year at the earliest.  At the request

10  of the court, they will be preserved.

11         THE COURT:  I order that.  As you said, you needed me

12  to do so.

13         MR. DUNN:  Thank your Honor.

14         The other point is No. 6, and that is something that

15  has just come up in the last few days with two of the

16  plaintiffs.

17         They're being retaliated against by the defendants

18  acting at their behest.  Plaintiff Ilka Rios -- and this is set

19  forth in my supplemental declaration -- she is here if you like

20  testimony from her, your Honor, but Ms. Ilka Rios is a poll

21  worker in the Bronx.  She is a coordinator.  She has been doing

22  it for several years.  I am told she has an exemplary record.

23  She was put on the list for this election year.  She completed

24  her training.  She got a phone call saying come pick your

25  packet up, and then the next day, which is was a few days ago,

1   they said never mind, you're not going to be working this year.

2   I was told -- a couple of levels of hearsay -- it was on

3   purpose and as retaliation for this.

4            THE COURT:  Have you tried to work this out with your

5   adversary?

6            MR. DUNN:  No.

7            THE COURT:  Let me ask you to take five minutes and

8   try to work out this claim of retaliation out.  I am sure they

9   aren't going to want to be on record as retaliating.

10           MR. DUNN:  Yes.

11           THE COURT:  Why don't you work out a stipulation.  The

12  stipulation would be that --

13           MR. RICHMAN:  Your Honor, the state law provides that

14  for the board to take action to remove a poll worker, except if

15  it is misconduct on election day, it has to be noticed in the

16  hearing.  However, the statute gives the political party

17  leadership, the people who recommend the appointments have the

18  automatic right to remove anyone without cause, and the board

19  is maintained by law to act on that.  It is Section 3-416,

20  Subdivision 2.

21           THE COURT:  Wait a second.

22           Is it your position that if the motive is retaliatory,

23  they can still do it?

24           MR. RICHMAN:  We have no control over the political

25  party.  They make the appointments and they can remove people

1    at will.  The statute specifically gives them the right to

2    ensure political loyalty.

3           THE COURT:  If they, under color of state law, which

4    is what it would be, retaliated, that is a problem.  What kind

5    of stipulation can we have here?

6           MS. SOTO:  Your Honor, I can say, as counsel for the

7    Bronx Democratic Committee, Executive Committee, that we have

8    no interest in removing Ilka Rios.  I have no knowledge of her

9    being removed as a poll worker, and I will ensure that whatever

10   poll working assignment that she was given will remain.

11          THE COURT:  Thank you.  Anyone else?

12          MR. DUNN:  No, your Honor.  As long as it covers

13   plaintiffs and declarants, folks who come forward and

14   cooperated with this investigation.

15          THE COURT:  Plaintiffs and declarants must not be

16   retaliated against.  Anything else?

17          MR. DUNN:  I think it would be very sensible for

18   everybody, for me to revise myself into coherency a bit.  On

19   the amended complaint, could we be given some time to file a

20   second amended complaint?

21          THE COURT:  Whatever time you need to make it really

22   good.  Thank you very much.

23          (Court adjourned)

24

25